# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

_____

DIANNE M. GNATZIG,

                Plaintiff,

      v.                                    Case No. 08-CV-246

MEDCO HEALTH SOLUTIONS, INC.,

                Defendant.

_____

## ORDER

Plaintiff Dianne Gnatzig ("Gnatzig") brings a claim for reverse discrimination against her former employer, Medco Health Solutions, Inc. ("Medco"), alleging that she was terminated based on her race. Gnatzig, who is Caucasian, was involved in a series of contentious interactions with a subordinate co-worker, who is African-American, that lead to Gnatzig's termination but not to the termination of her co-worker. Medco now moves for summary judgment on all of Gnatzig's claims and argues that it terminated Gnatzig because she was an ineffective manager, as illustrated by the ongoing conflicts with her subordinate, and not because of her race. For the reasons set forth in this opinion, the court determines that Medco is entitled to judgment as a matter of law and will grant its motion for summary judgment.

## BACKGROUND

Gnatzig worked as the Supervisor of Site Services for Medco, or its predecessor company, at Medco's Waukesha, Wisconsin, facility from February

1999, until her termination on June 22, 2006. (Defendant's Proposed Findings of Fact, hereinafter "DPFF," ¶ 5; Plaintiff's Proposed Findings of Fact, hereafter "PPFF," ¶¶ 3-5). As Supervisor of Site Services, Gnatzig was responsible for day-to-day maintenance of the facility and her responsibilities included maintaining security and supervising the mailroom assistant. (PPFF ¶¶ 28-29). During the events pertinent to this lawsuit, Regina Lathan ("Lathan") worked as Medco's Mailroom Assistant and provided administrative assistance to Gnatzig. (PPFF ¶ 17, 33-34). Lathan is African-American and her interactions with Gnatzig comprise the backdrop for Gnatzig's claims of reverse discrimination. (PPFF ¶ 18).

Gnatzig and Lathan worked together without incident for three years, however, a conflict between the women arose in 2004. At that time, and without Gnatzig's authorization, Lathan sent out a survey to all employees of Medco's Waukesha facility regarding the cafeteria supervisor. (PPFF ¶ 118-19). Management of cafeteria staff was part of Gnatzig's job responsibilities, and she felt that Lathan's distribution of the survey was an act of insubordination. (PPFF ¶ 18). Gnatzig issued Lathan a verbal warning and informed her that further acts of insubordination would result in discipline, up to and including termination. (PPFF ¶ 121). The two women had no further conflicts until two years later.

In April, 2006, problems arose between Gnatzig and Lathan regarding their participation on the Employee Activity Committee, which Gnatzig chaired and on which Lathan served as a volunteer member. (PPFF ¶ 128-129). The Committee

-2-

provided employees with opportunities to get involved in the community and made group decisions regarding which events to sponsor. The Committee had previously decided that it would not participate in the American Cancer Society Breast Cancer Walk. However, Lathan called the American Cancer Society and told the organization that Medco intended to participate. Gnatzig overheard the phone call from her adjoining cubicle and later confirmed for Lathan that the Committee did not wish to participate in the event. Despite this conversation, Lathan proceeded to place solicitation material for the Breast Cancer Walk in employee mailboxes. Gnatzig removed the flyers and informed Lathan that she had violated Medco's policy against distributing solicitation materials during work hours and using employee mailboxes. (PPFF ¶¶ 61, 129-132). As a result of the exchange, Lathan resigned from the Committee. (DPFF ¶ 40; PPFF ¶ 133). Gnatzig responded by composing a written warning for Lathan and asked her supervisor in New Jersey, Alex Krynicki ("Krynicki"), to review the warning. Krynicki, however, decided to disband the Employee Activity Committee because of the ongoing conflicts between Gnatzig and Lathan. (PPFF 7, 135, 255, 256).

Approximately one week later, Gnatzig advised Lathan that she should not leave confidential health information in the open and scolded her for failing to send out claims on a daily basis. (PPFF ¶ 138). Lathan complained to management that Gnatzig's comments were harassing. (PPFF ¶ 211). Lathan also stopped saying "Good morning" to Gnatzig and refused to speak to her on occasion. Gnatzig

relayed this to management, prompting management to have discussions with Lathan about her behavior. (PPFF ¶ 141).

During the same period in April 2006, Lathan filed a workplace harassment complaint against Gnatzig alleging that she "endured threats, harassments, and derogatory remarks." (PPFF ¶ 80). The complaint asserted that Gnatzig did the following: used the phrase "you people," told Lathan that she "fucked up" the database, told Lathan that if she could not properly fill in the database that she should find a different job, called her a "bitch," told Lathan to kiss her ass, asked "how stupid can you be?" asked if she needed to teach Lathan manners, informed her that she should re-do certain tasks, treated others more favorably, and changed Lathan's job description to include "assist in special projects as required by Facility Supervisor." (PPFF ¶ 83). Prior to Lathan's filing of the harassment charge, Krynicki considered disciplining Lathan because of the Breast Cancer Walk incident. (DPFF ¶ 51; PPFF ¶ 263). However, following Lathan's filing, Krynicki and the human resources personnel regarded the harassment charge as a higher priority than Lathan's performance issues. (PPFF ¶¶ 271-72). Further, management believed that formally disciplining Lathan after her harassment complaint may be misconstrued as retaliation. (PPFF ¶¶ 279, 281). Thus, Lathan was not formally disciplined regarding the incident.

Management held a meeting with Gnatzig to discuss Lathan's harassment complaint against her, at which Gnatzig admitted engaging in some of the alleged

conduct. (DPFF ¶ 65).  Shortly thereafter, on May 1, 2006, management informed Gnatzig that her behavior was inappropriate for a supervisor, and that she would report directly to a different supervisor, Tom Powers ("Powers"), in the future because he had more time available to devote to her ongoing conflicts with Lathan. (PPFF ¶¶ 87, 89).  Management also issued Gnatzig a written warning based on her conduct and derogatory remarks. (DPFF ¶ 65, PPFF ¶ 87).

The next major confrontation between Gnatzig and Lathan occurred on May 29, 2006.  Gnatzig asked Lathan to arrange for portable bathrooms for a company event.  Lathan made a phone call regarding the arrangements and was initially confused about the event's date.  However, by the end of the phone call, Lathan had provided the correct date.  Gnatzig overheard Lathan's phone call, confronted her, and asked Lathan why she did not simply ask Gnatzig for the date. (PPFF ¶ 150).  In response, Lathan walked into Gnatzig's cublicle, pointed her finger at Gnatzig and yelled: "Oh no, this is not a good day for this." (PPFF ¶ 151).  Following the exchange, Gnatzig relayed the events to Powers and suggested placing Lathan on a Performance Improvement Plan (PIP), to which Powers agreed. (PPFF ¶ 232).  Gnatzig took the step of developing the PIP, however, management later informed Gnatzig that they had "decided to go in a different direction." (PPFF ¶ 266).

Approximately one week later, on June 6, 2006, Lathan, Gnatzig and Powers held a conference call to discuss Lathan's behavior during the portable bathroom incident.  Powers informed Lathan that if insubordinate behavior continued, it would

lead to disciplinary action. (PPFF ¶ 155). The same day, Lathan sent an email to management stating that she was being retaliated against and harassed by Gnatzig and that she was taking the issue to an "outside agency." (PPFF ¶ 99). Lathan also called the Director of Human Resources and requested vacation time starting the following day and running until June 13, 2006. (PPFF ¶¶ 14, 156). Gnatzig overheard Lathan's phone call requesting immediate vacation time, including Lathan's statement that if her request was not granted she was "gonna blow." (PPFF ¶ 157). Lathan's request was ultimately granted. (PPFF ¶ 160). Before leaving for vacation, Lathan removed all her personal items from her cubicle. Gnatzig interpreted this act as indicating Lathan's intent to resign and deactivated Lathan's building card access. (PPFF ¶ 164, 165). When Gnatzig informed management of what she had done, she was immediately instructed to reactivate Lathan's access and did so. (PPFF ¶¶ 165-66).

During her vacation, Lathan filed a "Global Compliance" complaint alleging that Gnatzig called her derogatory names and claiming that the hostile work environment was affecting her health. Lathan returned from her vacation on June 14, 2006, and was involved in a meeting with management and Gnatzig. At the meeting, Lathan was instructed that she must provide feedback to Gnatzig and acknowledge Gnatzig as her supervisor. (PPFF ¶ 170). The following day, Lathan refused to return Gnatzig's greeting of "Good morning." Gnatzig reminded Lathan that she was instructed to speak to Gnatzig, to which Lathan responded that she did

Case 2:08-cv-00246-JPS   Filed 06/11/09   Page 6 of 22   Document 40

not need to say "hello" and that Gnatzig needed diversity training. (PPFF ¶¶ 172-74). Gnatzig made further comments and Lathan responded by throwing her hands in the air and stating something to the effect of "Well, I'm pretty much done with this" and walking out of the mailroom. In response, Gnatzig walked over and locked the door behind Lathan. Gnatzig eventually got up to unlock the door. However, before she could do so, Lathan attempted to reenter the room, discovered that the door was locked, and walked away. (PPFF ¶¶ 175, 176, 179).

Gnatzig's act of locking Lathan out of the mailroom was the last straw for management and they determined that termination was appropriate. Gnatzig was called into a meeting on June 22, 2006, and informed that she was being terminated because she had violated Medco's policy prohibiting retaliation against an employee who filed a harassment complaint, despite being warned against such behavior. Management specified that her retaliatory actions included deactiving Lathan's building card access and locking her out of the mailroom. (PPFF ¶ 283, 287-89). After terminating Gnatzig, Medco hired a white male as her replacement. (DPFF ¶ 147).

## LEGAL STANDARD

Summary judgment is appropriate where the moving party establishes that there is no genuine issue of material fact and that the party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Material facts" are those facts which "might affect the outcome of the suit,"

-7-

and a dispute about a material fact is "genuine" if a reasonable finder of fact could find in favor of the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party opposing summary judgment cannot simply rest on allegations or denials in its pleadings, but rather, it must also introduce affidavits or other evidence setting forth specific facts showing a genuine issue for trial. *Anders v. Waste Mgmt. of Wis.*, 463 F.3d 670, 675 (7th Cir. 2006). Finally, in conducting its review, the court views all facts and draws all reasonable inferences in favor of the nonmoving party. *Tanner v. Jupiter Realty Corp.*, 433 F.3d 913, 915 (7th Cir. 2006).

## ANALYSIS

Medco moves for summary judgment on Gnatzig's Title VII claim for reverse discrimination under 42 U.S.C. § 2000e *et seq.* and on her claim for a violation of 42 U.S.C. § 1981. The court will address each claim in turn.

## I.    Claim Under Title VII

To defeat a defendant's motion for summary judgment, a plaintiff alleging reverse discrimination in employment under Title VII must establish a prima facie case of racial discrimination using either the direct or indirect method of proof. *See Henry v. Jones*, 507 F.3d 558, 564 (7th Cir. 2007). The direct method of establishing race discrimination requires direct evidence that proves discriminatory conduct without reliance on inference or presumption. *Davis v. Con-Way Transp. Cent. Express, Inc.*, 368 F.3d 776, 783 (7th Cir. 2004). Direct evidence of a racially discriminatory firing can take two forms: 1) an outright admission by the

-8-

decisionmaker that he or she undertook the termination because of the plaintiff's race; or 2) a "convincing mosaic of circumstantial evidence" which directly points to a discriminatory reason for the termination. *See id.*

Alternatively, a reverse discrimination plaintiff may use the indirect method of proof to defeat a summary judgment motion. The indirect method requires a plaintiff to establish a prima facie case of discrimination through the burden-shifting framework established in *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Henry*, 507 F.3d at 564. Under this framework, the plaintiff bears the burden of establishing: 1) "background circumstances" demonstrating that the employer has a particular "reason or inclination to discriminate invidiously against whites"; or 2) evidence of something "fishy" about the facts of the case. *Id.* (quoting *Phelan v. City of Chicago*, 347 F.3d 679, 684-85 (7th Cir. 2003)). If a plaintiff fails to establish a prima facie case, the court will enter summary judgment for the defendant. *Id.* However, if the plaintiff satisfies his burden and establishes a prima facie case, then the burden shifts to the defendant to present a legitimate, nondiscriminatory reason for the termination. *See id.* If the defendant presents such a reason, the burden returns to the plaintiff to establish that the given reason is pretextual. *Id.*

## a. Direct Method of Proof

Medco argues that Gnatzig can present no direct evidence of discriminatory intent in its termination of Gnatzig's employment. Gnatzig disagrees, however, and attempts to marshal circumstantial evidence showing that Medco fired her based on

-9-

race. Specifically, Gnatzig argues that Medco acted in a discriminatory manner by firing her and not Lathan, though they exhibited similar conduct and were similarly-situated employees. However, Gnatzig fails to provide direct evidence that her race motivated Medco's termination decision.

Nowhere in the record does any Medco decision-maker state that the decision to fire Gnatzig was made because she is Caucasian. Given the lack of a direct admission, Gnatzig must provide a "convincing mosaic" of circumstantial evidence that directly points to discriminatory animus as the reason for her firing. *See Davis*, 368 F.3d at 783. Gnatzig attempts to provide such a mosaic; however, her attempts are unconvincing. Gnatzig points to evidence that Medco intended to discipline Lathan based on her behavior, but decided not to proceed with the discipline after Lathan filed a harassment complaint. Gnatzig further asserts that though she previously supervised Lathan, she and Lathan occupied similar positions immediately prior to her firing and were engaged in similarly-inappropriate conduct. Thus, Gnatzig concludes, the only difference between them was racial background and the fact that she was terminated and Lathan was not strongly suggests a discriminatory reason for her firing.

Gnatzig's argument fails at the outset because she and Lathan were not similarly-situated. To demonstrate that a another employee is "similarly situated," a plaintiff must show that the employee is "directly comparable to her in all material respects." *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002).

-10-

However, Gnatzig and Lathan were not comparable because they did not occupy similar positions in the company nor did they exhibit similar behavior. Therefore, the fact that Medco fired Gnatzig and not Lathan does not establish circumstantial evidence pointing directly to racial discrimination.

First, Gnatzig and Lathan were not similarly-situated because they held different jobs with distinct responsibilities and employer expectations. Medco employed Gnatzig as a Supervisor of Site Services, while Lathan worked as a Mailroom Assistant and provided administrative support to Gnatzig. (DPFF ¶ 10; PPFF ¶ 33). More importantly, Gnatzig was Lathan's direct supervisor. Gnatzig supervised Lathan for the vast majority of their co-employment at Medco, from 2001 until less than a month before Gnatzig's termination in June 2006. (DPFF ¶ 102). Supervisors and subordinates, by their definitions, seem inherently dissimilar in certain "material respects" because they have distinct job duties and occupy different levels in the company heirarchy.

Finally, the fact that both Gnatzig and Lathan reported to Powers in the month prior to Gnatzig's termination does not render them similarly-situated. To be similarly-situated, the women must be comparable in all material respects. *Patterson*, 281 F.3d at 680. However, Gnatzig and Lathan were not comparable in *all* material respects simply because they were directly supervised by the same individual for the final weeks of Gnatzig's employment. The differences in their job responsibilities and job titles did not change.

-11-

Second, the women did not exhibit comparably inappropriate behavior for which they were disparately disciplined. To establish disparate discipline between similarly-situated employees, a plaintiff must show that she and the second employee were subject to the same supervisor and standards, and also "engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Radue v. Kimberly-Clark* Corp. 219 F.3d 612, 617-18 (7th Cir. 2000). Gnatzig's conduct can be differentiated because her actions were those of a supervisor towards a subordinate. Additionally, whether or not Gnatzig's actions can be construed as subjectively "worse" conduct than distributing unauthorized flyers and pointing a finger in someone's face, Gnatzig's conduct in deactivating Lathan's access card and locking her out of the mailroom is distinguishable because it physically barred Lathan from her worksite.

More importantly, Gnatzig engaged in these activities after she was specifically instructed not to take any retaliatory measures against Lathan. Medco has an interest in preventing its employees from retaliating against individuals who file harassment complaints and in preventing the appearance of such actions. Gnatzig's actions implicated these concerns while Lathan's did not. Lathan's allegations of harassment against Gnatzig and Gnatzig's failure to heed warnings against retaliatory actions present "differentiating circumstances" that legitimize any distinction in Medco's discipline of Gnatzig and Lathan.

-12-

Finally, Gnatzig points to no circumstances suggesting reverse discrimination other than the fact that she was terminated and Lathan was not. She presents no evidence that other white employees were discriminated against or treated less favorably by management. Indeed, Medco replaced Gnatzig with another white employee. (DPFF ¶ 147). Gnatzig's claims that Lathan received more favorable disciplinary treatment and that her complaints of harassment received more favorable attention than Gnatzig's fail to assemble a "convincing mosaic" of circumstantial evidence that Medco fired her for racially discriminatory reasons.

### b. Indirect Method

The court determined that Gnatzig fails to establish a prima facie case of discrimination using the direct method of proof. Thus, to avoid summary judgment, she must establish such a case under the indirect method. To establish a prima facie case of reverse discrimination, Gnatzig must point to circumstances showing that Medco had a "reason or inclination to discriminate invidiously against whites" or that the facts of the case suggest Medco was up to something "fishy." *Henry*, 507 F.3d at 564. Gnatzig argues that Medco's affirmative action policy, its status as an Equal Opportunity Employer, and the fact that it encouraged managers to maintain a diverse workforce provide adequate "background circumstances" to suggest an inclination to discriminate. Gnatzig further argues that Medco's "disparate discipline" of Lathan and Gnatzig and "disparate treatment" of their respective complaints about harassment suggest something "fishy."

-13-

However, Gnatzig is overly optimistic in her reading and application of the case law cited in her brief to support her assertion of adequate "background circumstances." She cites *Mihal v. St. Vincent Carmel Hospital, Inc.*, 2007 WL 4256607 (S.D. Ind. Nov. 30, 2007), *Jones v. City of Springfield*, 540 F.Supp 2d 1023 (C.D. Ill. 2008), and *Rayl v. Fort Wayne Community Schools*, 87 F.Supp.2d 870 (N.D. Ind. 2000) to support her contention that an affirmative action policy and internal encouragement to consider minority job candidates is sufficient to establish background evidence of reverse racial discrimination. However, the cases do not substantiate her claim that these circumstances alone are sufficient to establish a prima facie case.

Gnatzig first cites *Mihal v. St. Vincent Carmel Hospital* for the proposition that reverse discrimination may exist when supervisors are under pressure to increase minority employment in the company. However, the case does not excuse Gnatzig's lack of evidence suggesting racial discrimination. Instead of denying summary judgment, the court in Mihal *granted* summary judgment to the defendant employer on the plaintiff's reverse discrimination claim under Title VII. 2007 WL 4256607, at *1. Thus, Gnatzig cites the case only for its discrete statement that reverse discrimination may exist where supervisors are under particular pressure to increase the proportion of minorities in the workforce. *Id.* (quoting *Preston v. Wisconsin Health Fund*, 397 F.3d 539, 542 (7th Cir. 2005)). Gnatzig chooses to ignore the remainder of the court's holding. The court goes on to state that no inference of reverse

-14-

discrimination was reasonable in the case before it because the plaintiff's supervisors were under no special pressure to support minorities at the expense of Caucasian employees. *Id.*

Instead of supporting Gnatzig's argument, the *Mihal* case bolsters the defendant's argument that she cannot establish a prima facie case of discrimination. Similar to the plaintiff in *Mihal*, Gnatzig fails to provide evidence that the Medco managers were under "special pressure" to favor minority employees over Caucasian employees. Company training sessions merely emphasizing the importance of diversity certainly do not constitute "special pressure" to favor minorities, indeed, they are common-place in the corporate world. Further, Medco hired a Caucasian employee as Gnatzig's replacement, resulting in no change in the racial make-up of its workforce. Thus, Gnatzig's termination itself cannot suggest special pressure to favor minority employees at the expense of caucasian employees. Finally, evidence that Medco is an Equal Opportunity Employer or has an affirmative action policy is insufficient to establish a prima facie case of discrimination. *See Whalen v. Rubin*, 91 F.3d 1041, 1045 (7th Cir. 1996) (stating that the "mere existence of an affirmative action policy" is insufficient to establish discriminatory animus and requiring the plaintiff to establish a link between the defendant's policies and its actions towards the plaintiff).

Gnatzig next cites *Jones v. City of Springfield* for the proposition that a plaintiff's reverse discrimination claim may survive summary judgment if she can

-15-

show evidence that there was at "least some...pressure" to favor a minority employee. (Pl.'s Br. 16). However, Gnatzig conveniently omits the full quotation, which reads: "at least some *public* pressure." *Jones*, 540 F.Supp.2d at 1033. (emphasis added). Gnatzig provides no evidence of public pressure towards Medco, which is likely what led to her selective editing. Further, the "pressure" to favor minority employees in *Jones* involved much more than generic encouragement for managers to maintain a diverse workforce. Instead, the case involved public and local government pressure for the defendant police department to promote an African-American officer to the rank of sergeant. The plaintiff in *Jones* alleged that African-American interest groups, a city alderman, and the public in general put specific pressure on the Commission to enable promotion of an African-American. *Id*. at 1031. The court found that this evidence established a prima facie case. *Id*. at 1033. ("Because there is evidence there was at least some public pressure to promote an African-American to sergeant, the Court concludes that Jones has made a sufficient showing of the requisite "background circumstances" in order to withstand summary judgment.").

Gnatzig argues that her evidence is similarly sufficient to establish a prima facie case. However, Gnatzig points to evidence that Krynicki and Powers attended company diversity trainings emphasizing the importance of a diverse workplace and were encouraged to explore opportunities for diversity. Gnatzig's evidence is easily distinguishable from the public and local government pressure present in *Jones*.

-16-

Gnatzig provides no evidence of public pressure and no specific evidence of company pressure to either terminate Caucasian employees or to favor minority employees at the expense of Caucasian employees. Thus, Gnatzig's evidence in no way resembles that in *Jones* and fails to suggest an inclination to discriminate invidiously against whites.

Finally, Gnatzig cites *Rayl v. Fort Wayne Community Schools* for the proposition that a reverse discrimination plaintiff defeats summary judgment by showing that the employer had government incentives to maintain diversity and expressed an interest in doing so. Once again, Gnatzig stretches the case law beyond its limits. In *Rayl*, the court found that the plaintiff, a caucasian male, established a prima facie case of reverse discrimination, though the court ultimately granted summary judgment to the defendant school district. 87 F.Supp.2d at 883. The plaintiff presented evidence of statements by school administrators that school aide positions were reserved for minorities and women. *Id.* He also presented evidence of a pattern of discriminatory hiring because only two of fifty-three aide positions were filled by white males. *Id.* at 883-84. Gnatzig presents no comparable "background circumstances." Unlike in *Rayl*, where the plaintiff presented evidence that the school district chose not to hire him because he was white, Gnatzig presents no evidence that Medco's affirmative action plan or Medco's status as an Equal Opportunity Employer had any impact on its decision to fire her. Thus, *Rayl* does not save Gnatzig's otherwise insufficient prima facie case.

-17-

In addition to arguing background circumstances, Gnatzig also argues that Medco exhibited "fishy" behavior, suggesting discrimination, by disparately disciplining her and Lathan and by disparately treating their complaints of workplace harassment. However, contrary to Gnatzig's assertions, Lathan was not insulated from discipline. Management disciplined Lathan through verbal counseling on several occasions, including a June 6, 2006 conference call and June 14, 2006 meeting. (PPFF ¶ 155; 170). Further, Gnatzig's complaints about Lathan's behavior were not ignored. Instead, these complaints triggered management's discussions with Lathan about her behavior.

Finally, assertions of "disparate discipline" implies a false similarity between Gnatzig and Lathan. Medco dealt with the women differently because they had different positions and different company expectations. Medco had justification for employing different disciplinary methods because Gnatzig was a supervisor and Lathan was not. A supervisor occupies a position of power relative to her subordinate employees and must effectively manage people. Thus, an employer may take inappropriate behavior by a supervisor towards a subordinate employee more seriously than inappropriate behavior by a subordinate employee. This increased employer concern may result in more severe discipline applied to supervisors, as in the instant case. Based on the aforementioned, Gnatzig fails to establish that Medco acted in a "fishy" manner.

-18-

Gnatzig fails to establish a prima facie case for discrimination and the court need not proceed to the next step of the burden-shifting framework. However, even if Gnatzig had established a prima facie case, her claim would still fail because she cannot establish that Medco's legitimate reason for terminating her was pretextual. Medco asserts that it fired Gnatzig based on her performance. Specifically, Medco argues that Gnatzig was an incapable supervisor because she could not effectively communicate with or manage Lathan. Medco also asserts that it fired Gnatzig out of legitimate concerns that, as a manager, Gnatzig's actions would be construed as retaliatory against Lathan.

The record supports these concerns. Gnatzig's inability to manage and maintain effective communication with Lathan required so much company energy and attention that supervision of Gnatzig was switched to a different manager with more time to devote to the ongoing conflicts between the two women. (PPFF ¶ 89). Further, Gnatzig displayed behavior that Medco felt inappropriate for a supervisor. When confronted by management, Gnatzig admitted engaging in some of the conduct Lathan complained of in her harassment complaint. (DPFF ¶ 65). In addition, Gnatzig continued to engage in such actions. Gnatzig deactivated Lathan's building card access and locked her out of the mailroom, despite being warned by management not to engage in any behavior that may be considered retaliatory. Finally, Gnatzig was so inept at managing Lathan, one of the duties of her job, that

-19-

management removed the responsibility from her in the weeks before her termination.

Gnatzig's ongoing conflicts with Lathan indicated she was unable to effectively execute her job responsibility for supervising the mailroom assistant. She also engaged in behavior that could be interpreted as retaliatory, in direct violation of management instructions. Therefore, Gnatzig cannot establish that Medco fired her because she is caucasian, and not because she was an ineffective manager.

**c.    Racially Hostile Work Environment**

Gnatzig also argues that she was subjected to a racially hostile work environment based on Medco's racially-motivated refusal to discipline Lathan. There are four elements to a hostile work environment under Title VII: 1) the plaintiff must be the object of unwelcome harassment; 2) the harassment must be based on the plaintiff's race; 3) it must be sufficiently severe and pervasive so as to alter the conditions of employment and create an abusive atmosphere; and 4) there must be a basis for employer liability. *Luckie v. Ameritech Corp.*, 389 F.3d 708, 713 (7th Cir. 2004). Gnatzig fails to meet the second element because she cannot establish harassment sufficiently related to her race.

To establish harassment based on race and meet the second element, a plaintiff must generally allege that she was subjected to overtly race-related behavior, such as racial slurs or epithets. *See Luckie*, 389 F.3d at 713. Gnatzig does not claim that she was the victim of any such slurs or epithets by Medco.

-20-

Indeed, there is no evidence that any occurred. The court does not doubt that overt hostility existed between Gnatzig and Lathan in the workplace. Their behavior suggests as much. However, the hostility directed towards Gnatzig was not racial in nature. The fact that clashing co-workers happen to be of two different racial backgrounds does not support a racially hostile work environment claim under Title VII.

Gnatzig attempts to obscure the lack of racial references by arguing that Medco's refusal to discipline *Lathan* created a racially hostile work environment against *her*. Gnatzig makes a twisted argument that Medco facilitated an environment of harassment by Lathan against Gnatzig by not properly disciplining Lathan, a decision that was based on the fact that Lathan is African-American. However, Gnatzig provides no support for her theory that when an employer fails to discipline a second employee because of that employee's race, and such discipline may have stopped (non-racial) harassment against the plaintiff, a racially hostile workplace exists. Gnatzig ultimately fails to show that any allegedly harassing behavior by Lathan was racial in nature. Therefore, she cannot maintain a racially hostile work environment claim.

## II.  Claim Under § 1981

In addition to her Title VII claim, Gnatzig also asserts that Medco violated 42 U.S.C. § 1981 by terminating her on the basis of her race. The court determined above that Gnatzig's Title VII claim fails as a matter of law. Her claim under § 1981

Case 2:08-cv-00246-JPS   Filed 06/11/09   Page 21 of 22   Document 40

suffers the same fate. This is because the same standards govern claims for intentional discrimination under both § 1981 and Title VII. *Friedel v. City of Madison*, 832 F.2d 965, 971 (7th Cir. 1987). As a result, Gnatzig cannot maintain her claim and the court will grant summary judgment for Medco.

Accordingly,

**IT IS ORDERED** that the defendant's motion for summary judgment (Docket #12) be and the same is hereby **GRANTED**.

**IT IS FURTHER ORDERED** that this action be and the same is hereby **DISMISSED** on its merits together with costs as taxed by the Clerk of Court.

The Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 11th day of June, 2009.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge

-22-